Filed 3/15/22  P. v. Allagoa CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B308118 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA093900) |
| v. | |
| HAYDEN O. ALLAGOA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lauren Weis Birnstein, Judge.  Affirmed.

Boyce & Schaefer and Laura Schaefer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Amanda Lopez and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant and appellant Hayden O. Allagoa of first degree premeditated murder (Pen. Code, § 187, subd. (a) [1] [count 1]) and assault with a semi-automatic firearm (§ 254, subd. (b) [count 3]).[2]  The jury found true firearm allegations associated with each count (§ 12022.53, subds. (b)–(d) [count 1]; § 12022.5, subd. (a)).

The trial court Imposed a sentence of 25 years to life in count 1, and struck the attached firearm enhancement in the interest of justice (§ 12022.53, subds. (b)–(d)).  It imposed a concurrent sentence of 10 years in count 3, consisting of the middle term of six years for assault with a semi-automatic firearm and four years for the associated firearm enhancement (§ 12022.5, subd. (a)).

On appeal, Allagoa contends that there was insufficient evidence of premeditation; the manner in which he was legally represented violated his constitutional rights; the prosecutor committed misconduct in closing argument; counsel provided ineffective assistance; the trial court abused its discretion by admitting and excluding certain evidence; and cumulative errors deprived him of a fair trial.

We affirm the trial court's judgment.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The prosecutor dismissed a charge of attempted premeditated murder in count 2.  (§§ 187/664.)

# FACTS

*Prosecution*

## Micrin Lias

On September 1, 2016, sometime between 4:00 p.m. and 5:00 p.m., Micrin Lias went to Koff's Liquor store. Lias met his good friend Joseph Goudeau there and the men started drinking in the parking lot outside the store. Lias was also smoking marijuana.

At about 8:30 p.m., Lias saw Allagoa, who he had seen on one other occasion, following Goudeau on the sidewalk and into the parking lot. At that point, Goudeau was "pretty smashed up" from drinking. Lias was also intoxicated. Goudeau turned around and started arguing with Allagoa. Lias tried to intervene. He asked them why they were fighting. He said, "Get it off y'all chest. Go and get it over with. Let it go." Goudeau took off his shirt and put it on the ground as if to fight, and then picked it up. Allagoa punched Goudeau, knocking him down. Goudeau got up and punched Allagoa, knocking Allagoa to the ground.

All three men ran to the north part of the parking lot. Allagoa pulled out a semiautomatic gun and aimed it at Goudeau.[3] Lias had not seen the gun before Allagoa pulled it out. Lias positioned himself between Allagoa and Goudeau, and found himself "looking down a barrel." He pleaded with Allagoa not to

---

[3] Lias testified he did not remember seeing Goudeau pick anything up from the ground. After he was shown surveillance video of the event, Lias agreed that Goudeau had picked up an object, but he could not tell what it was.

shoot Goudeau. Lias thought Goudeau was behind him, but Goudeau stepped to the right of him while Lias had his back turned. Allagoa warned Lias, "Watch out, big homie." Allagoa aimed at Goudeau and pulled the trigger twice, but the gun was jammed and did not fire. Allagoa cleared the gun's chamber. As he was racking the gun to load another bullet, Goudeau moved around Lias and knocked the gun out of Allagoa's hands. All three men ran to retrieve it, but Lias and Goudeau were very drunk and they both fell down. Allagoa got the gun. Goudeau jumped up, and Allagoa shot him from a distance of about 10 to 15 feet.

Lias did not see the actual shooting because he was still getting up, but he heard the shot. When he looked up he saw that Goudeau had fallen into a planter. Lias went over to Goudeau. Goudeau had been shot just below his chest. Lias did not see anything in Goudeau's hands. At first, Allagoa stood there looking at Goudeau as if to "see if he gonna die." Then he walked away. Lias jumped at Allagoa. Allagoa fled and Lias gave chase. Allagoa pointed the gun at Lias as he was running away and Lias retreated into the parking lot. Lias was unarmed. Lias had not seen Goudeau with a weapon at any point during the fight.

Lias identified Allagoa as the shooter in a photographic lineup right after the killing, and identified him again in court.

**Thomas Curran**

Thomas Curran and Bryan Benedetti were building a wall at Benedetti's house near the liquor store parking lot on September 1, 2016. They were in Benedetti's truck when Curran

4

saw two men (Allagoa and Goudeau) in a heated argument. A third man (Lias) was trying to stop them from fighting. Curran did not know any of the men.

Curran saw the men begin to fight. Curran could not remember who threw the first punch. Allagoa was "very aggravated." He was "coming after [Goudeau] like a mad bull." As the men were "fighting and boxing," Curran saw a heavy object swinging around in Allagoa's pocket. Allagoa was beating Goudeau and knocked him to the ground. Allagoa was "getting the better" of Goudeau, who was "a lot weaker." Although both men threw punches, Goudeau did not hit Allagoa as often as Allagoa hit Goudeau. Curran testified that Allagoa was "whacking the heck out of [Goudeau]." "[Allagoa] was socking [Goudeau] multiple times over and over again like a pro boxer. And [Goudeau] was like, a kindergartener, first base."

Goudeau picked up a brick, and Allagoa pulled a gun out of his pocket.[4] It was a small semi-automatic handgun. Goudeau dropped the brick and picked it up several times. Allagoa started punching Goudeau with one hand and pistol whipping him with the other hand.

The gun flew out of Allagoa's hand. Goudeau and Allagoa ran across the parking lot to retrieve it. They fought for possession of the gun, but Allagoa got it. Allagoa and Goudeau fought for about 15 to 20 seconds and then separated to approximately 20 feet apart. Lias got between them and tried to intervene. He pleaded with Allagoa, "No, don't do it. Don't go

---

[4] Curran told the detectives Goudeau picked up several bricks and was trying to throw them at Allagoa. Curran testified that he did not recall Goudeau ever successfully hitting Allagoa with a brick.

there.  No, no, no." Although Curran had trouble hearing generally, he heard Lias clearly.  Lias waved his arms, trying to block Allagoa from shooting Goudeau as if he was defending a basketball shot.  Allagoa waved the gun back and forth trying to get around Lias.  Curran heard a gunshot.  He did not see the actual shooting, however, because a parked suburban was blocking his view of Goudeau.  Allagoa walked out of the parking lot, but then returned with the gun still in his hand.  Curran told Benedetti to get them out of the parking lot before Allagoa started shooting witnesses.

In court, Curran identified Allagoa as the person holding the gun.  The day after the killing, Curran identified Allagoa as the gunman in photograph #1 in a lineup , but then told officers that the shooter was depicted in either photograph #3 or #5.  At trial, Curran explained that he purposely misidentified Allagoa because "all kinds of people started closing in on us, listening" when he was talking to the detectives.  He wanted "to take a target off [his] back."  He identified Allagoa as the shooter at the preliminary hearing.  Curran testified as truthfully as he could in court.  He had recently suffered a head injury.  He thought the head injury "vaguely" affected his memory of the incident; he did not remember Allagoa pulling the gun out of his pocket and putting it back several times as he previously stated, but he remembered everything else clearly.

**Bryan Benedetti**

Bryan Benedetti was building a block wall with Curran in the parking lot that abutted Benedetti's property, when

6

Benedetti heard a loud argument between Goudeau and Allagoa.[5] Benedetti was only about 17 feet away from Allagoa and Goudeau.  Benedetti recognized Goudeau and Lias because they hung out in the parking lot regularly.  Initially Benedetti tried to ignore the fight because fights were common in that area, but when the argument continued and began to escalate he started paying attention.  Curran told Benedetti that Allagoa had taken out a gun and said they had better get out of there.  Benedetti agreed that they should leave.  Benedetti and Curran got into Benedetti's truck and started to pull out.

Allagoa and Goudeau were punching each other and chasing each other around.  Benedetti did not see who threw the first punch, but he saw "many punches thrown."  Lias got between the two men and tried to stop the fight.  Allagoa punched Goudeau in the mouth.  Goudeau picked up a brick and threw it at Allagoa.  The fight continued after Goudeau threw the brick.  Allagoa punched Goudeau while holding the gun.  Then the gun flew out of Allagoa's hand.[6]

Benedetti spun the wheels of his truck to try to distract Goudeau and Allagoa.  As Benedetti pulled out of the parking lot,

---

[5] Benedetti gave the police surveillance footage video, which was played for the jury.

[6] Benedetti testified that he was not able to identify the object that Allagoa was holding as a gun until it flew out of his hand.  Benedetti told the officers who interviewed him the day after the shooting that he never saw a gun.  At trial, he explained that he was afraid of being involved in the incident when he talked to the police.

he heard a gunshot. He did not see the shooting because he was concentrating on driving.

Benedetti identified Allagoa as the man with the gun in a photographic lineup. He saw Allagoa's face while standing about 17 feet away from him during the fight.

### The Investigation

Los Angeles Police Department Officer Christopher Silva responded to the scene of the shooting. When he arrived, Goudeau was conscious and was transported to the hospital. The hospital later notified Officer Silva that Goudeau had died. Officers recovered a cell phone, a Luger 9-millimeter bullet casing, and bricks from the scene.

The deputy medical examiner who conducted Goudeau's autopsy testified that Goudeau suffered a single bullet wound to the upper abdomen, which was recovered from the left side of Goudeau's back. There was no soot or stippling, so the shooter was at least two feet away when he shot Goudeau. Goudeau had alcohol, marijuana, and ephedrine in his blood. His blood alcohol level measured .081 at the time of the autopsy.

A firearms examiner testified that the bullet recovered from Goudeau's body was fired from a semiautomatic pistol.

Allagoa was arrested on November 23, 2016.

### Surveillance Camera Footage

The jury was shown surveillance footage of the fight that Benedetti provided to the police. The video does not depict the physical altercation in its entirety, nor does it show the shooting,

and it is of low quality and resolution. It depicts Allagoa, Goudeau, and Lias. Goudeau can be seen throwing his shirt on the ground and picking it up again. The video shows the start of the fight, and Allagoa is seen knocking Goudeau to the ground. Goudeau gets back on his feet and the men continue to fight. At one point Allagoa appears to be backing away, and Goudeau is shown picking up something from the ground. All three men then run behind a parked suburban. The video does not depict the gun flying from Allagoa's hand. The continuing fight and the shooting occur out of view of the camera; though Lias is shown waving his hands over his head at one point. The video then depicts Allagoa leaving the scene.

Other surveillance video was obtained from the strip mall cameras adjacent to the parking lot; the mall videos depict multiple camera views. The videos show Allagoa in the parking lot approximately 20 minutes before the fight began. A van is shown pulling into the parking lot. The driver goes into a store and when he returns Allagoa gets into the van and they drive away. Almost 20 minutes later, Allagoa can be seen walking into the parking lot. He walks directly to a car and stands next to it. Allagoa then walks past an S.U.V. The video depicts a heavy object in his right pocket swinging as he walks.

The prosecution also introduced camera footage from a nearby apartment building that depicts Allagoa departing the scene.

**Facebook and Cell Phone Records**

Posts on Allagoa's Facebook account and data in his cell phone from the time period between the shooting and arrest

9

indicated that he fled the Los Angeles area and attempted to obtain a passport to cross the border into Canada. Allagoa's cell phone and Facebook posts contained multiple incriminating messages, indicating that, a few weeks prior to the shooting, he purchased a 9-millimeter gun matching the caliber of the casing recovered at the scene, and that he was on the run after the shooting.

**The Jail Incident**

Testimony and video evidence was presented that, during trial, when Allagoa and Lias were both being held in county jail, Allagoa threatened Lias and told Lias that he should have shot him.

*Defense*

Babak Malek, a crime scene reconstruction expert, enhanced the brightness and contrast of the surveillance videos, and zoomed in so that Allagoa, Goudeau, and Lias could be more closely viewed. Based on his review of the enhanced surveillance video, Babek testified that he observed Lias pointing an object that resembled a gun at Allagoa, who was backing away. Malek also saw a brick being thrown at Allagoa.

Malek did not see Allagoa pull anything resembling a gun from his pocket or waist area, and did not see Allagoa holding an object resembling a gun. With the exception of a brick, Malek did not observe any objects flying through the air.

Dr. Mitchell Eisen, a psychologist with an expertise in eyewitness memory, testified that memory is malleable and can

degrade and suffer alteration with the passage of time, receipt of new information, and other factors.

Defense investigator Michael Howard testified that, in an interview he conducted, Lias's description of Allagoa's location when Allagoa fired the gun was inconsistent with Lias's testimony at trial.

DNA evidence was presented demonstrating that both Allagoa and Goudeau were likely contributors of DNA on a swab obtained from a brick located in the planter where Goudeau fell after he was shot.

**DISCUSSION**

## *I. Sufficiency of the Evidence of Premeditation and Deliberation*

Allagoa contends that there was insufficient evidence to support the jury's finding that he acted with premeditation and deliberation. When reviewing for sufficiency of the evidence, we consider "'""the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."'" [Citation.]" (*People v. Casares* (2016) 62 Cal.4th 808, 823 (*Casares*), disapproved of on another ground in *People v. Dalton* (2019) 7 Cal.5th 166, 214; *People v. Clark* (2011) 52 Cal.4th 856, 942–943.) "As a general matter, juries may accept some parts of a witness's testimony and reject other parts . . . ." (*People v. Collins* (2021) 65 Cal.App.5th 333, 345.) "'Resolution of conflicts and

inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' [Citations.]" (*People v. Brown* (2014) 59 Cal.4th 86, 106.) "'. . . [I]t is the jury rather than the reviewing court that weighs the evidence, resolves conflicting inferences and determines whether the People have established guilt beyond a reasonable doubt.' [Citation.]" (*Casares*, *supra*, at p. 823.) "Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." (*People v. Jones* (1990) 51 Cal.3d 294, 314.)

"In the context of first degree murder, '"premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." [Citation.]' [Citation.] 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." [Citations.]' [Citation.]" (*People v. Lee* (2011) 51 Cal.4th 620, 636 (*Lee*).)

In *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), our Supreme Court described three types of evidence that indicate premeditation and deliberation: "(1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be

12

characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (*Id.* at pp. 26–27; see also *People v. Lenart* (2004) 32 Cal.4th 1107, 1127 (*Lenart*).) "[The Supreme Court has] sustain[ed] verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*Anderson, supra*, 70 Cal.2d at pp. 26–27.)

"The *Anderson* factors are not the exclusive means for establishing premeditation and deliberation." (*Lenart, supra*, 32 Cal.4th at p. 1127.)

### Analysis

Substantial evidence supports the jury's finding that Allagoa murdered Goudeau after premeditation and deliberation. First, there was evidence from which a jury could reasonably infer that Allagoa brought a loaded gun to a fistfight, which suggests planning and conscious choice. Surveillance video

13

depicts Allagoa leaving the parking lot in a van about 20 minutes prior to the fight. When Allagoa returns to the parking lot, he immediately walks over to a gray sport wagon and stands next to it for several minutes. No witnesses testified that they observed Allagoa with a gun before he left the parking lot in the van, and the videos do not suggest that Allagoa had a gun until he returned to the parking lot, when a heavy object can be seen swinging in the pocket of his shorts in the manner that a gun would. The jury could reasonably infer from the evidence that Allagoa retrieved the gun to use it in the fight and "considered the possibility of a violent encounter" with Goudeau. (*Lee, supra*, 51 Cal.4th at p. 636.) Evidence that a defendant carried a murder weapon to the scene of a killing has been held to raise the reasonable inference "that he considered the possibility of homicide from the outset." (*People v. Steele* (2002) 27 Cal.4th 1230, 1250 [defendant brought knife used to murder victim into victim's house].)

Second, Allagoa had several opportunities to reflect and change course during the altercation, but did not. Lias testified that prior to the confrontation, he saw Allagoa following Goudeau into the parking lot, leading to the confrontation between the men. Once the conflict ensued, but before Allagoa attempted to shoot Goudeau, Lias physically placed himself between the two men and pleaded with Allagoa not to harm Goudeau. Lias's intervention provided Allagoa time for reflection, but Allagoa was not deterred. Despite Lias's pleas, Allagoa tried to fire the gun at Goudeau unsuccessfully not once, but twice.

When Allagoa pulled the trigger of the gun the first two times, the gun jammed. Because the gun was a semi-automatic, Allagoa had to clear the chamber and then rack the gun to load a

14

new bullet before he could attempt to fire again. Allagoa was in a position to walk away from the fight. Allagoa and Goudeau were not in the throes of a physical altercation when Allagoa cleared the gun's chamber; Lias was still between them shielding Goudeau from the gun. Allagoa had control of the situation. He had time to think about whether he wanted to kill Goudeau as he prepared to fire again.

Although Allagoa and Goudeau struggled over the gun before Allagoa pulled the trigger a third time, resulting in the fatal shot, Curran observed that Allagoa was approximately 20 feet away from Goudeau. Allagoa had enough distance between himself and Goudeau to remove himself from the fight, and with a bullet chambered he had the means to protect himself immediately if Goudeau approached him too closely; instead he chose to take the third shot from a distance. The jurors could reasonably infer from these facts that Allagoa considered his actions multiple times during the altercation and made a conscious decision to shoot and kill Goudeau. Substantial evidence supports the jury's premeditation and deliberation finding.

## II. Continuity of Legal Representation at Trial

Allagoa next argues that his constitutional rights were violated because his case was tried by multiple attorneys who were not present for the entire trial. At the time proceedings began in this case, Allagoa's counsel Alana Yakovlev was in the advanced stages of pregnancy. Natalie Lowis, a newly sworn in associate, assisted Yakovlev and other senior attorneys throughout the proceedings. Yakovlev was due to deliver her

baby during trial, and informed the court that in the event that she went into labor her colleague Louis Kosnett would be ready and available to take over the case. Yakovlev assured the court that Kosnett would be apprised of all evidentiary rulings made in his absence. Allagoa expressly agreed to have another attorney take over the case.[7] Prior to the presentation of evidence, the trial court advised the jury that Yakovlev, Kosnett, and Lowis would all be representing Allagoa due to Yakovlev's pregnancy:

"Mr. Allagoa . . . is represented by three attorneys. And when you see Ms. Yakovlev stand up, you'll know why. Her due date is around December 20th. But there are other counsel that will step right in. They're going to probably be participating in these proceedings as we go on anyway. So Ms. Yakovlev is representing Mr. Allagoa. Also Natalie Lowis, sitting at counsel table, is also representing Mr. Allagoa. And Mr. Louis Kosnett is representing Mr. Allagoa. Thank you so much.

"And by their vast numbers, it doesn't mean anything about the case. It's just because, number one, I just swore Ms. Lowis in. So she's a very young attorney. But she's very smart and she's been practicing for a while but not licensed. So she's here and she knows a lot about this case. And Mr. Kosnett I haven't seen before today, but he's here. So I don't want you to assume that the case is more serious than it would be just because the defendant has a lot of attorneys. Okay?"

---

[7] In a pre-trial hearing, the trial court stated: "[Ms. Yakovlev] you are quite pregnant and you have maintained that there is another attorney ready, willing, and able to take over. I want to get a waiver of your client that that's okay with him. [¶] Is that okay with you, Mr. Allagoa?" Allagoa responded, "Yes, your honor."

Yakovlev appeared on all five days of pre-trial proceedings and on seven and a half of the twelve days of trial. She delivered her baby near the end of the trial, but then returned to make the closing argument to the jury. Kosnett appeared in court on nine and a half days of the trial, and appeared for some of the pre-trial proceedings as well. On December 23rd, the day that Yakovlev gave birth, neither she nor Kosnett could appear in court. Shirin Buckman, a senior attorney who attended Allagoa's preliminary hearing and was familiar with the case, appeared in their stead. Lowis assisted all three senior attorneys throughout the proceedings and appeared on all but one day of the trial. Lowis conducted examinations of multiple witnesses, but she was always supervised by a senior attorney in court.

## Analysis

*Attorney Experience and Continuity*

Allagoa first complains regarding his representation by Lowis and the alleged lack of continuity in his legal representation. Allagoa contends that Lowis, the newly sworn-in attorney who lacked the necessary experience, tried his case by default. He argues that it was not anticipated that she would represent him in that capacity, and that the trial court went so far as to advise the jury that Lowis was too young to try the case. Allagoa asserts that the lack of continuity in his representation combined with the fact that Lowis acted as the lead attorney conveyed to the jury that his counsel was not committed to his case.

Allagoa's characterization of Lowis's role in the trial and the trial court's assessment of Lowis's competence is inaccurate. The trial court's advisement to the jury demonstrates that the court expected Lowis to participate in trying the case, and was confident in her abilities. The court stated that Lowis was smart, and knew the case well. The court told the jury that Lowis would not be trying the case alone because she was less experienced than the other attorneys representing Allagoa, but that she would be participating in the trial along with Yakovlev and Kosnett. This is exactly what occurred. Lowis appeared regularly and examined multiple witnesses, but she was always supervised by a more senior attorney when she did so.[8]

Moreover, the trial court's early explanation regarding Allagoa's representation avoided any confusion on the part of the jury as to Allagoa's attorneys' commitment to his case. The jury knew that there would be a change in representation when Yakovlev went into labor. The jurors were advised that her absence would be due to medical necessity; they would not have

_____

[8] Allagoa argues that he did not consent to the mid-trial substitution of Lowis as his attorney as required by Code of Civil Procedure sections 284 and 285, and did not make an informed and intelligent decision to have Lowis represent him. He also argues that the trial court should have advised him and protected him from the dangers of having an inexperienced lawyer act as the lead attorney in his case. We need not address these arguments in light of the fact that Lowis did not assume the role of lead attorney. She was supervised by a more senior attorney throughout the trial, as Yakovlev had assured the court that she would be. If Lowis held the position of lead attorney, both Kosnett's and Buckman's participation would have been unnecessary in Yakovlev's absence.

18

inferred that Yakovlev (or Allagoa's other attorneys) lacked commitment to Allagoa's case as Allagoa alleges. To the contrary, Yakovlev demonstrated personal commitment to Allagoa's defense—she returned to give the closing statement on Allagoa's behalf, despite the fact that she had given birth only two weeks earlier and Kosnett was available and prepared to make closing arguments in her stead. Finally, the court's remark about Lowis's level of experience was part of its explanation to the jury as to the number of attorneys on Allagoa's team, ensuring that there was no inference drawn that his case required an unusually large legal team.

*Ability to Argue Witness Credibility*

Allagoa contends that Yakovlev's absence for several days of trial prior to returning to make the closing argument to the jury prevented her from representing him effectively in argument. He asserts that, having missed several days of trial, Yakovlev was incapable of competently assessing and arguing witness credibility, and Curran's credibility in particular.

The transcript of Yakovlev's closing arguments belies this contention. Yakovlev argued that none of the prosecution's witnesses accurately testified regarding the events that occurred, and that, most importantly, their recollections contradicted what the video recordings showed:

"[N]ot only do the witness testimonies not add up, they don't match up with the objective evidence in this case, which is the video. [¶] [¶] [¶] . . . You can see a brick being thrown. You don't think an object such as a gun being thrown would be depicted in the video? Especially given the witness's version of

19

the events, that it went across the parking lot and, according to Mr. Curran, it landed in the middle where the gate was, where the gate began on the other side of the parking lot. That's still within the purview of the camera. That still would have been captured on the camera."

Yakovlev posited that Curran's memory was unreliable because he and Benedetti had discussed the case prior to testimony and, as a result, had formed false memories and corroborated each other's statements despite not having independently consistent recollections, as the defense's memory expert testified often occurs.

Yakovlev emphasized that ". . . Mr. Curran admitted he had very bad eyesight. The conditions were dark. . . . Mr. Curran also admitted that he thought he saw a cell phone when he saw something being thrown. He admitted he did not see the shooting.

"So what really happened? How about the I.D.? This is the best part. Mr. Curran immediately after the incident was shown a lineup, a photographic lineup. He did not choose Mr. Allagoa. He picked two fillers. 'Fillers' are other people that they try to disguise to make sure that there's an accurate identification. He chose number 3 and number 5. He couldn't make a choice. Guess what? The police didn't retain this document. It wasn't convenient for them to do so. It wasn't helpful to their case because, when a person fails to make a positive identification, clearly, that's not helpful for their case; so they destroyed this document. Subsequently, a year and a half later, 18 months, not only does Mr. Curran miraculously I.D. [the defendant], he remembers what number it was. 'It was number 1.' How

awesome?  A sudden drip of clarity.  Speculation, speculation, speculation."

Yakovlev summarized:  "Mr. Curran has bad eyesight.  He doesn't remember.  He's all over the place.  His memory has failed."   She concluded:  "You don't have to be bound by their wiggly-wobbly version of what is just mere speculation and conjecture.  It's not reasonable for you to do so."

In an attempt to undermine the fact that Yakovlev devoted significant time arguing credibility in her statement to the jury, Allagoa contends that courts have held it is impossible for counsel to effectively argue regarding credibility if counsel was not present to observe a witness's testimony.  Allagoa first analogizes his case to *People v. Manson* (1976) 61 Cal.App.3d 102 (*Manson*).  In *Manson*, co-defendant Van Houten's trial counsel failed to appear after the parties had rested their cases, but before the trial court ruled on submitted jury instructions and the attorneys made closing statements.  (*Id.* at p. 197.)  The court appointed new trial counsel to represent Van Houten, over Van Houten's objection.  (*Ibid.*)  Prior to closing statements, Van Houten's counsel moved for a mistrial, arguing that his absence during witness testimony made it impossible for him to effectively argue regarding the witnesses' credibility.  (*Id.* at p. 198.)  The trial court denied the motion.  (*Ibid.*)

The Court of Appeal held that trial counsel's representation of Van Houten was ineffective, citing the observations of the trial court made in another context earlier in the trial:  "'It would undoubtedly place an undue burden on any counsel coming into the case.  At this date the trial has been in progress for five months; the transcript is in excess of 18,000 pages, and it would be a terrible burden to bring a new attorney into the case and

21

expect him to adequately and effectively represent anyone for the remainder of the trial.'" (*Manson, supra*, 61 Cal.App.3d at p. 200.) The appellate court held that counsel was incapable of arguing credibility in light of the circumstances, and that the disappearance of Van Houten's first attorney after the submission of all evidence severely interrupted the continuity of representation necessary to a fair trial. (*Ibid.*)

Allagoa argues that, in *People v. Clark* (2011) 52 Cal.4th 856 (*Clark*), our Supreme Court approved the Court of Appeal's opinion in *Manson*, stating that "counsel's summation was constitutionally inadequate . . . [H]aving had no opportunity to observe the demeanor of the many witnesses at trial, he could not effectively argue the significant issue of credibility during closing remarks." (*Id.* at p. 991.) Allagoa neglects to mention that the Supreme Court subsequently distinguished *Manson* from the case before it: "We conclude that the extreme circumstances presented in *Manson* are easily distinguishable from this case. In *Manson*, the timing of counsel's substitution after the presentation of evidence was 'truly crucial.' (*People v. Manson, supra*, 61 Cal.App.3d at p. 203, fn. 102.) By contrast here, [defense counsel] joined the defense team shortly after commencement of the prosecution's case-in-chief and observed the testimony of most of the prosecution witnesses . . . . Further, he was assisted by [co-counsel], who was present for all of the guilt phase testimony. The trial court did not abuse its discretion in denying the mistrial motions in the present case." (*Clark, supra*, 52 Cal.4th at p. 991.)

Allagoa also relies on *In re Rodriguez* (1981) 119 Cal.App.3d 457 (*Rodriguez*), arguing that "'[t]he abandonment of Allagoa by Ms. Yakovlev without a contingency plan was

misconduct which 'transcends typical claims of incompetence.' [Citation.]" In *Rodriguez*, the defendant filed a writ for habeas corpus alleging that he was deprived of a fair trial due to the combination of his counsel's deficiencies and the prosecutor's misconduct. (*Id.* at p. 464.) Rodriguez submitted the declaration of his second attorney, Smallwood, which detailed the situation. The declaration averred that Smallwood was admitted to practice approximately two months prior to appearing at Rodriguez's trial with DeVilbiss, the attorney who Rodriguez hired to try the case. Because Smallwood was inexperienced, he and DeVilbiss agreed that he would assist by conducting legal research only. (*Id.* at p. 465.) "When DeVilbiss did not show up for trial . . . [Rodriguez] agreed that the trial would proceed with Smallwood as counsel. Rodriguez was not aware that Smallwood had no trial experience, and Smallwood did not tell him. [¶] [Two days later,] DeVilbiss phoned Smallwood to say he did not intend to participate further in the trial. Smallwood told [Rodriguez] that DeVilbiss was withdrawing from the case, but did not inform him of the possibility of moving for mistrial or requesting a further continuance to obtain an experienced trial lawyer. He assumed that because he was cocounsel of record he had no choice but to carry on alone. [¶] Smallwood then proceeded to represent [Rodriguez] when trial recommenced [the next day]. [That] evening . . . , DeVilbiss agreed to return to make closing argument, provided the matter were [*sic*] continued [by several days]. The trial court granted a continuance. Smallwood and DeVilbiss did not, however, consult about the trial during the intervening weekend and they discussed the evidence of 5 prosecution witnesses who testified during DeVilbiss' absence for

23

no more than 10 or 15 minutes before he presented his argument to the jury." (*Ibid.*)

The Court of Appeal catalogued the prosecutor's misconduct in Rodriguez's case: the prosecutor cast aspersions on defendant and defense counsel at the preliminary hearing, commented on Rodriguez's failure to testify to the jury (which it classified as "'blatant'" *Griffin*[9] error), improperly inquired regarding a police officer witness's experience with defense counsel tactics, elicited an expert medical witness's opinion of Rodriguez's guilt, and elicited a psychologist witness's opinion of the victim's credibility. (*Rodriguez*, *supra*, 119 Cal.App.3d at pp. 467–469.) The Court of Appeal concluded that due to the combination of Rodriguez's attorneys' conduct at trial, the prosecutor's misbehavior, and the trial court's inability to control the proceedings, "the net result was that the trial was turned into something of a circus, complete with sideshows, disappearing acts, clowning, and tricks which could only divert the jury's attention from the serious business of determining guilt or innocence in accordance with proper standards." (*Id.* at p. 467.) Accordingly, it reversed the judgment. (*Id.* at p. 470.)

The conduct of defense counsel in Allagoa's case is easily distinguishable from both *Manson* and *Rodriguez*. First, Allagoa was not abandoned without a contingency plan. Prior to the commencement of trial, Yakovlev anticipated the very likely event that she might give birth during the trial, and she put in place a sensible plan for representation of Allagoa; indeed, Allagoa expressly consented to that plan. In contrast, neither Van Houten nor Rodriguez had any notice that their attorneys

---

[9] *Griffin v. California* (1965) 380 U.S. 609, 615.

24

might not represent them for the entire trial, let alone that there was a high probability of that occurring.

Second, there was a significant lapse in continuity in Van Houten's trial; Van Houten's first attorney failed to appear in court without warning, and her second attorney was appointed without the benefit of any prior familiarity with the case. New counsel had to rely entirely on the 18,000-page record of a five-month trial to assess the witnesses' credibility. Rodriguez's counsel also failed to appear at trial without notice, leaving an inexperienced attorney to try the case alone. In contrast, Allagoa was represented by a team of attorneys who coordinated on his case from the outset, and had familiarity with the proceedings through personal observation of the trial, which spanned 12 days. Both Yakovlev and Kosnett were present for most of the trial. There was a single day—the day that Yakovlev gave birth—upon which neither Yakovlev nor Kosnett was present. However, on that day Buckman, an experienced attorney who attended Allagoa's preliminary hearing, appeared as counsel along with Lowis. Lowis was present for all but one day of the proceedings and assisted all three senior attorneys, who had the benefit of her observations and impressions. Whereas Allagoa's attorneys were able to share their first-hand knowledge of the trial, Van Houten's counsel was forced to go into closing statements cold, without the benefit of either personal familiarity with the trial or the experience of colleagues to draw upon. Rodriguez's second attorney, who had practiced for less than a year, conducted his first trial without assistance.

Third, unlike counsel in *Manson* and *Rodriguez*, all of Allagoa's attorneys, with the exception of Buckman, attended large portions of the trial, and personally observed and

participated in the proceedings. Van Houten's second attorney had not been present for any witness testimony and had not personally observed the jury. Rodriguez's original attorney returned to deliver closing arguments without appearing for a single day of trial or consulting with trial counsel for more than 15 minutes.

Finally, none of Allagoa's attorneys raised any concerns that they were unable to represent Allagoa competently. If there were such concerns, they could have been raised in a motion for new trial, in declarations in other post-trial proceedings, or otherwise expressed to the court. The court stated it was frustrated on one occasion—the day that Yakovlev gave birth and Buckman finished examining a witness that Yakovlev had begun examining the day before. The court admonished Lowis for failing to properly advise Buckman of its rulings as to that specific witness. The court stated that it would be appropriate for Buckman to question a new witness, but that it "was frustrating for the court that I have to go over all the rulings again" with regard to the witness Yakovlev had questioned the day before. The court did not indicate Buckman's examination of the witness was detrimental to Allagoa, and Allagoa does not allege that he suffered prejudice as a result.

*Ability to Argue Heat of Passion*

In closing arguments, Yakovlev painted Goudeau as the aggressor, and argued that Allagoa acted in self-defense or in imperfect self-defense. Allagoa contends that Yakovlev's absence from trial prior to making closing statements caused her to overlook making the argument in closing that he had acted in the

heat of passion and was guilty only of manslaughter. We reject this contention as well.

"Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter. Heat of passion arises if, "'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.'" [Citation.]" (*People v. Beltran* (2013) 56 Cal.4th 935, 942, fn. omitted (*Beltran*).)

"A killing committed under the unreasonable but good faith belief in the need to act in self-defense is a killing done without malice and also constitutes voluntary manslaughter." (*Beltran*, *supra*, 56 Cal.4th at p. 942, fn. 3.) A killing committed in the reasonable good faith belief in the need to act in self-defense absolves liability for murder and manslaughter. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.)

"A criminal defendant's federal and state constitutional rights to counsel (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15) includes the right to *effective* legal assistance." (*People v. Mai* (2013) 57 Cal.4th 986, 1009, italics omitted (*Mai*).) To establish ineffective assistance of counsel, "the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*Ibid.*) ""A reasonable probability is a

probability sufficient to undermine confidence in the outcome." [Citation.]' [Citation.]" (*In re Jones* (1996) 13 Cal.4th 552, 561.)

"When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance . . . . [A] conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*Mai, supra*, 57 Cal.4th at p. 1009.)

"If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed." (*Strickland v. Washington* (1984) 466 U.S. 668, 697.)

Here, counsel was not asked for an explanation. The jury was instructed on Justifiable Homicide: Self Defense (CALCRIM No. 505), Voluntary Manslaughter: Imperfect Self-Defense (CALCRIM No. 571), and Voluntary Manslaughter: Heat of Passion (CALCRIM No. 570). A competent attorney could make a reasonable tactical choice to focus on self-defense and imperfect self-defense rather than arguing that Allagoa acted in the heat of passion.

The facts in Allagoa's case arguably lent greater support to the theory that he acted in self-defense, whether perfect or imperfect, than in the heat of passion. As Allagoa himself pointed out in his opening brief, "[t]he record does not establish what occurred before the fight that led to the shooting, or why [Allagoa and Goudeau] were fighting. Whatever inference might be drawn from the record's silence would rest on sheer speculation." There is simply no way of discerning what Allagoa

28

and Goudeau were arguing about from the evidence presented, let alone whether the argument would cause a rational person to react rashly without reflection.

The only evidence to support a heat of passion theory was that Goudeau (1) threw down his shirt and (2) threw a brick at Allagoa. A reasonable person would not react rashly simply because another person threw his shirt on the ground. Additionally, even if we assume that an ordinary person would react rashly and without reflection if a brick was thrown at them, there was conflicting testimony as to whether Goudeau threw the brick before or after Allagoa pointed the gun at him, which casts doubt as to whether Allagoa was reacting to Goudeau or acting as the aggressor.

Given the state of the evidence, counsel could reasonably conclude that the jury would be more likely to find that Allagoa acted in self-defense. It was undisputed that Allagoa shot Goudeau immediately following a struggle over the gun. A jury could conclude that Allagoa feared for his life and shot Goudeau because he believed that if he did not, Goudeau might instead overpower him, take the gun, and shoot him. Such a conclusion would result in either a full acquittal or a conviction for manslaughter, depending on the reasonableness of Allagoa's belief. Counsel could reasonably decide that focusing on Goudeau's irrational anger in the midst of the altercation would detract from these other, potentially more viable, defenses.

Additionally, Goudeau cannot show prejudice. The jury was instructed under CALCRIM No. 570 that: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of

29

a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; [¶] AND [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment."

The court further instructed the jury regarding first degree murder under CALCRIM No. 520: "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted *willfully* if he intended to kill. The defendant acted *deliberately* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with *premeditation* if he decided to kill before completing the act that caused death. . . . [¶] . . . A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time."

To find Allagoa committed premeditated and deliberate murder, the jury had to consider and reject the possibility that he acted in the heat of passion beyond a reasonable doubt. (*People v. Lopez* (2020) 46 Cal.App.5th 505, 525 (*Lopez*) ["Jurors are presumed to follow the instructions they are given"].) Allagoa cannot demonstrate prejudice.

30

*Prejudice*

Finally, Allagoa contends that, in light of the fact that the alleged deficiencies at trial were the result of the lack of continuity in his representation, he need not demonstrate prejudice. Allagoa argues that reversal is constitutionally compelled under *Manson*, *Clark*, *Rodriguez*, and *United States v. Cronic* (1984) 466 U.S. 648 (*Cronic*). These cases do not support his assertion. As is clear from our discussion of *Manson* and *Rodriguez* above, both defendants suffered significant prejudice. In *Clark*, the court distinguished *Manson*, and affirmed the judgment. (*Clark*, *supra*, 52 Cal.4th at p. 1008.) In *Cronic*, the United States Supreme Court reversed the Court of Appeals' judgment because the respondent did not "demonstrate that counsel failed to function in any meaningful sense." (*Cronic*, *supra*, 466 U.S. at p. 666.) In short, Allagoa points to no cases in which a court held that counsel was ineffective without a showing of prejudice. The contention is without merit.

## III. Ineffective Assistance of Counsel Related to Evidence Obtained From The Search of Allagoa's Cell Phone

Officers seized Allagoa's cell phone when they arrested him on November 23, 2016, but police did not obtain a warrant to search the contents of the phone until April 28, 2018. As relevant to Allagoa's arguments here, the cell phone contained evidence of his flight after the shooting, as well as several incriminating internet searches made between the date of the murder and the date of his arrest, all of which were admitted at trial. Allagoa argues that his counsel was ineffective for: (1) failing to timely

31

move to suppress the cell phone evidence on the ground that law enforcement's delay in seeking a warrant to search the phone was unreasonable; and (2) failing to object to the internet searches relating to Allagoa's interest in retaining an attorney on the specific ground that their admission impinged on his constitutional right to counsel.

Allagoa contends that he was prejudiced by admission of evidence of his flight and several internet searches—including "'Hawthorne shooting,'" "'a good attorney,'" a lawyer for "'a felony'", "'how do police tap your phone,'" as well as "'how to beat a murder case'"—which he argues were powerful evidence of consciousness of guilt, as demonstrated by the fact that the prosecutor focused on this evidence in closing argument.

Allagoa has failed to establish prejudice. It was uncontested that Allagoa shot and killed Goudeau. The only issue was his intent in doing so. While the evidence of his flight and the internet searches arguably demonstrated consciousness of guilt, they were not probative of premeditation and deliberation, which the jury found beyond a reasonable doubt. The jury necessarily based its premeditation finding on the evidence that we discussed in Section I of this opinion, as nothing Allagoa did after the shooting (evidenced by the material contained in his cell phone) suggested that he decided to kill after careful thought and weighing of the considerations for and against killing. Given the strong evidence that Allagoa killed Goudeau and acted with premeditation and deliberation, it is not reasonably probable that the outcome of the proceedings would have been different if the flight and internet search evidence had been suppressed or excluded. Allagoa has not met his burden of demonstrating ineffective assistance of counsel.

## IV. Alleged Prosecutorial Misconduct

'"Under California law, a prosecutor commits reversible misconduct if he or she makes use of "deceptive or reprehensible methods" when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" [Citations.] [¶] "'[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]'" [Citation.] A defendant who fails to object at trial 'waive[s] any error or misconduct emanating from the prosecutor's argument that could have been cured by a timely admonition.' [Citation.]

"'"'[In closing statements,] the prosecution has broad discretion to state its views as to what the evidence shows and what inferences may be drawn therefrom.'" [citation.] . . . .' [Citation.] 'When we review a claim of prosecutorial remarks constituting misconduct, we examine whether there is a reasonable likelihood that the jury would have understood the remark to cause the mischief complained of. [Citation.]'

[Citation.] 'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' [Citation.]" (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1402–1403.)

## Analysis

Allagoa complains that the prosecutor committed misconduct by (1) insinuating that he had evidence of Allagoa's motive for killing Goudeau that was not presented at trial, (2) arguing that Allagoa retrieved a gun shortly before the shooting based on speculation unsupported by the evidence, (3) mis-stating the prosecution's burden of proof beyond a reasonable doubt, (4) arguing that Allagoa's exercise of his right to counsel proved his guilt, and (5) improperly commenting on Allagoa's decision not to testify at trial.

Allagoa concedes that his counsel did not object to the alleged misconduct at trial, but argues that his counsel provided ineffective assistance by failing to object.

In all but one instance—the prosecutor's argument regarding Allagoa's exercise of the right to counsel—we conclude that the prosecutor's remarks did not amount to misconduct, because the jury would not have construed the remarks in the manner Allagoa claims. As to those instances, it necessarily follows that Allagoa waived the objections and that counsel did

34

not provide ineffective assistance: there was no harm to cure, and Allagoa suffered no prejudice.

With respect to Allagoa's claim that the prosecutor's comments on his exercise of the right to counsel were inappropriate and prejudicial, we conclude that the remarks constitute misconduct, but that any harm could have been cured by an admonition, and that counsel could have had a reasonable tactical reason for not objecting in closing arguments.

*Statements Regarding Motive*

In her closing statement, defense counsel argued that Allagoa had no motive to murder Goudeau: "[W]here's the evidence? You're doing mere guesswork. Where's the person from the van? Why aren't they on the stand?"

In rebuttal, the prosecutor responded: "One thing that [defense counsel] said, she said, 'we don't even know what the motive was.' There's a jury instruction about that. *I wish I could stand here and tell you why. And I have my own reasons, but the law doesn't allow me to just spout out what I think happened unless it comes out in testimony. I'm not allowed to do that.*

"The fact of the matter is we know these two guys wanted to fight, and we know defendant brought a gun to the fight. Whatever the reason -- what possible justification could there be for someone -- right? -- it doesn't justify it. It maybe helps us to answer some questions, but you are not required to understand why he wanted to kill [Goudeau]. All you're asked to do is rule on the evidence." (Italics added.)

Allagoa contends that the prosecutor's statements (as indicated in italics) intimated that the prosecutor had personal

35

knowledge of Allagoa's guilt that was not based upon the prosecutor's legitimate inferences from the record, in violation of Allagoa's constitutional right to confront witnesses.

We cannot conclude that the jury would have understood the prosecutor to mean that he had evidence beyond the record that proved Allagoa had motive to kill, and that the jury should rely on this unidentified extra-record evidence to find Allagoa guilty. The prosecutor's remarks informed the jury that, although the prosecutor would have liked to argue that Allagoa had a motive to kill Goudeau, he could not "just spout out" his own opinions without basis to support them in the record. The prosecutor further explained that he did not have to prove motive for the jury to find Allagoa guilty of murder, and he advised the jury that it could verify the rules regarding motive in the instructions. The prosecutor did not violate Allagoa's right to confront witnesses by impermissibly placing statements of a witness who was unavailable for cross-examination before the jury.[10]

---

[10] The law upon which Allagoa relies does not support his argument that a prosecutor who indicates that he may have his own opinions based on unidentified evidence outside of the record commits misconduct that amounts to a violation of the constitutional right to confrontation. In *People v. Bell* (1989) 49 Cal.3d 502, the prosecutor deliberately introduced inadmissible and prejudicial evidence by reading a police report into the record over defense counsel's sustained objection, in the course of examining an expert witness. The Supreme Court held that the statements constituted "particularly egregious [misconduct] because the prosecutor put before the jury the hearsay statement of a person who was not available for cross-examination, and that statement suggested that defendant not only possessed a weapon like that believed to have been used by the murderer, but was

*Inference that Allagoa Retrieved the Gun Just Prior to the Shooting*

In his closing statement, the prosecutor commented that it would be reasonable to conclude that Allagoa retrieved a gun when he left the parking lot in the van or when he walked over to the gray sport wagon right after he returned to the parking lot. This was a fair comment on the evidence. As we discussed in Section I, none of the witnesses testified to seeing a gun before the fight broke out. The video depicts Allagoa with a heavy object swinging in his pocket only after he returned to the parking lot and walked away from the sport wagon. With no evidence that Allagoa had a gun before he left the parking lot and both (1) eyewitness testimony that he possessed and used a gun after returning to the parking lot and (2) video showing an object consistent with Allagoa having a gun in his pocket after returning to the parking lot, it is a reasonable inference that Allagoa obtained the gun either when he left the parking lot in the van or retrieved it from the sport wagon immediately after he returned. The prosecutor's comment was not inappropriate. (See *People v. Hamilton* (2009) 45 Cal.4th 863, 928 [prosecutors have wide latitude during argument, and may be vigorous as long as it amounts to fair comment on the evidence].)

---

cleaning it on the eve of the robbery/murder." (*Id.* at p. 533.) Here, the prosecutor did not read specific inadmissible statements into the record in contravention of a trial court's explicit ruling. The cases are simply not comparable.

*Articulation of the Beyond a Reasonable Doubt*
*Standard*

In closing arguments, the prosecutor stated:

"[A]pply the evidence to the law and follow the law.  That's it.  You've got those instructions.  You can take them back."

\* \* \*

"[Beyond a reasonable doubt is] [a]n abiding conviction [in the defendant's guilt].  *Here's what I can tell you about reasonable doubt.  It's the exact same standard that's used in every criminal case that's tried in this country.  It's been around since long before all of us were born, and it's probably going to be around long after we're all gone.  That is the standard.  [¶] Here's what we know. You have to be reasonable.  Right?  It's the fundamental word in that description.  Be reasonable.  What is reasonable under the circumstances?*  The other thing I want you to keep in mind, part of that instruction, 'Everything in life is open to some possible or imaginary doubt.'  We can imagine things that could have happened.  But what we have to do is rely on evidence to draw conclusions.  And if the evidence doesn't prove something, that's okay.  Right?  But you can't speculate about what might have happened.  You have to look at the evidence . . . [N]ot what I say, not what [defense counsel] says.  [¶] . . . And if you can draw two conclusions, one that points toward innocence and one that points toward guilt, you have to choose the one that points to innocence. [¶] . . . [But] that conclusion has to be reasonable."  (Italics added.)

Allagoa argues that, in the italicized portion of the comments quoted above, the prosecutor misstated the prosecution's burden of proving guilt beyond a reasonable doubt

by telling the jury that it could find him guilty based on a reasonable view of the evidence.

Viewed in context, we cannot conclude that the jury would have misunderstood the beyond a reasonable doubt standard based on the prosecutor's arguments. First, the prosecutor reminded the jury that the trial court's instructions controlled, not the attorneys' arguments. Second, the prosecutor quoted the correct definition of the beyond a reasonable doubt standard from the instruction—"[a]n abiding conviction". Third, in the challenged portion of his statements, the prosecutor argued only that the jury could not find Allagoa innocent on the basis of speculation, not that the jury *must* find him guilty if that was a reasonable conclusion, regardless of whether there was a contrary reasonable conclusion. Fourth, the prosecutor correctly stated that if there were two reasonable conclusions to be drawn, the jury was bound to draw the one favoring innocence.

Additionally, defense counsel devoted considerable time to the standard and stated it clearly and correctly in closing argument: "Beyond a reasonable doubt is an abiding conviction that the charge is true."

Finally, the trial court correctly instructed the jury on the beyond a reasonable doubt standard under CALCRIM No. 220, and instructed the jury to ignore any contrary argument by counsel under CALCRIM No. 200. We presume that the jury understood the trial court's instructions and followed them as given. (*Lopez*, *supra*, 46 Cal.App.5th at p. 525.)

*Comments Relating to Allagoa's Decision to Retain Counsel*

Allagoa argues, and the People concede, that the prosecution's assertion in closing argument that his internet search of the phrase "'How much does a good attorney cost?'" was the kind of question "that a guilty person asks" amounted to misconduct.  We agree.  It is well established that comment on a person's decision to exercise the constitutional right to representation by counsel penalizes that right and is prohibited. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 64–65.)

However, if counsel had timely objected, any prejudice could have been cured by an admonishment and/or appropriate instruction by the trial court that the prosecutor's comment on defendant's constitutional right to counsel was improper and should be disregarded.  This was not a case where identity was at issue.  It was uncontested that Allagoa shot Goudeau and that Goudeau died as a result of that gunshot wound.  The only question was whether Allagoa was justified in shooting Goudeau or whether his reason for shooting him (self-defense, imperfect self-defense, or heat of passion) mitigated his culpability.  Under the circumstances, it would be reasonable for anyone to seek legal representation, regardless of guilt, which the trial court could have explained to the jury.  Because he failed to object and the error was curable, Allagoa forfeited the contention.

Moreover, we cannot say that counsel was ineffective for failing to object on this record.  As we have explained, this is not a case in which the danger of prejudice due to the remarks was great, and "'the decision . . . whether to object to comments made by the prosecutor in closing argument is a highly tactical one.'"

40

(*People v. Johnsen* (2021) 10 Cal.5th 1116, 1165.)  Defense counsel may reasonably decide to rely on his or her own counterarguments rather than objecting to the prosecutor's comments in closing statements.  (*Id.* at p. 1166.)  Although defense counsel did not have the opportunity to explain her decision in this case, it appears that this was the tactical decision she made.

In response to the prosecutor's remarks, defense counsel told the jury that Allagoa was very young when the shooting occurred and that he was scared.  Counsel explained that Allagoa was arrested after he elected to return to Los Angeles of his own accord.  She argued:  "The internet searches presented by the District Attorney regarding hiring a lawyer, regarding police tactics, how to beat a criminal charge shows that he was looking to participate in the justice system head-on rather than escape it."

Considering that the numerous other incriminating internet searches Allagoa made—including "'how strict is the Canadian border on warrants,'" and "'how to beat a murder case'"—could permissibly be used against him, a strategy that encompassed all of Allagoa's potentially incriminating searches was a reasonable tactic.  Counsel did not provide ineffective assistance.

> *Comments That Allagoa Failed to Call Available Witnesses*

Finally, Allagoa claims that the prosecutor improperly referred to his failure to testify in closing argument.  "'[T]he Fifth Amendment . . . forbids either comment by the prosecution on the

41

accused's silence or instructions by the court that such silence is evidence of guilt.' (*Griffin v. California* (1965) 380 U.S. 609, 615.) The prosecutor's argument cannot refer to the absence of evidence that only the defendant's testimony could provide. (See *People v. Carter* (2005) 36 Cal.4th 1215, 1266.) The rule, however, does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses. (See *People v. Lewis* (2009) 46 Cal.4th 1255, 1304.)" (*People v. Brady* (2010) 50 Cal.4th 547, 565–566 (*Brady*).)

In closing arguments, defense counsel stated that there were witnesses to the shooting that detectives should have interviewed, implying that the police investigation was incomplete and unfair to Allagoa: "Detectives saw there were a bunch of people -- you see there's people in the video, not only on the one side of the parking lot near the liquor store but also where the actual scene took place . . . . Why weren't these people interviewed? They have ways of finding these people. Why not?"

In rebuttal, the prosecutor responded that he did not have a way to locate these witnesses, but that, if defense counsel believed they would exonerate Allagoa, she could have located them because the witnesses were people Allagoa knew:

"Ms. Yakovlev said, 'Look, there are a lot of things that could have been presented.' The subpoena power of the court works both ways. The defense has every right to present evidence in the same way that we do. . . . [¶] [Ms. Yakovlev] said, 'What about all these other people from the crime scene?' *Look, the defendant was hanging out there. He knows who was there.* If they wanted to bring them in, they could have. . . . The guy that was in the van -- right? I don't know who he was. *I can't look at*

*the video and tell you. You know who knows? The defendant.* They have access to that information. They want to call those people to testify and present a case, they are allowed to do that."

Allagoa argues that the italicized comments are improper remarks relating to his decision to exercise his constitutional right not to testify. A fair reading of the prosecutor's comments does not support this interpretation. The prosecutor argued that if the defense felt that the witnesses in the parking lot would exonerate him, Allagoa knew how to find them, and the defense could have subpoenaed those witnesses to testify on Allagoa's behalf. Nothing in the passage relates to Allagoa's decision not to testify himself, and it would not have been necessary for Allagoa to testify for the defense to identify potential witnesses. The prosecutor's remarks were a permissible comment on the defense's failure to call logical witnesses in support of Allagoa's case. (*Brady*, *supra*, 50 Cal.4th at p. 566.)

Additionally, the trial court instructed the jury under CALCRIM No. 355 that Allagoa had a constitutional right not to testify, that the burden was on the prosecution to prove his guilt beyond a reasonable doubt, and that the jury should not allow Allagoa's exercise of his right not to testify to influence its decision in any way. (*Lopez*, *supra*, 46 Cal.App.5th at p. 525 ["Jurors are presumed to follow the instructions they are given"].)

## V. Evidence of Goudeau's Past Violent Conduct

Under Evidence Code section 1103, subdivision (a)(1), the defendant in a criminal action may "offer evidence of the victim's 'character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of

conduct)' in order 'to prove conduct of the victim in conformity with the character or trait of character.'" (*People v. Fuiava* (2012) 53 Cal.4th 622, 695 (*Fuiava*).)  "Once the defendant has offered such evidence, the prosecution is permitted to offer its own character evidence of the victim to rebut the defendant's evidence.  [Citation.]  Further, if the defendant has offered 'evidence that the victim had a character for violence or a trait of character tending to show violence,' the prosecution is permitted to offer 'evidence of the *defendant's* character for violence or trait of character for violence (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct)' in order 'to prove conduct of the defendant in conformity with the character or trait of character.'  [Citation.]  In other words, if . . . a defendant offers evidence to establish that the victim was a violent person, thereby inviting the jury to infer that the victim acted violently during the events in question, then the prosecution is permitted to introduce evidence demonstrating that (1) the victim was not a violent person and (2) the defendant was a violent person, from which the jury might infer it was the defendant who acted violently."  (*Id.* at pp. 695–696.)

"[Evidence Code] section 352 permits [the trial court] to exclude evidence if in the court's discretion 'its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'  Like all proffered evidence, character evidence is subject to exclusion under that section.  [Citation.]"  (*People v. Shoemaker* (1982) 135 Cal.App.3d 442, 448 (*Shoemaker*).)

We review the trial court's rulings regarding the admission of evidence under Evidence Code section 352 for abuse of discretion. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1118.) "'The discretion is as broad as necessary to deal with the great variety of factual situations in which the issue arises, and in most instances the appellate courts will uphold its exercise whether the conviction is admitted or excluded.'" (*People v. Hinton* (2006) 37 Cal.4th 839, 887; accord, *People v. Clark* (2011) 52 Cal.4th 856, 932.)

**Proceedings**

Prior to trial, defense counsel successfully moved to introduce evidence pursuant to Evidence Code section 1103, subdivision (a)(1), that Goudeau had sustained a prior conviction for misdemeanor battery in 2015. Defense counsel also sought admission of statements by Benedetti and Derrick Bynum that Goudeau was seen fighting in the parking lot on prior occasions.

*Goudeau's Battery Conviction*

With respect to Goudeau's battery conviction, the trial court stated that it would admit the evidence and instruct the jury on battery so that it would understand battery "can be the slightest touching if it's an unwanted touching." The court would further instruct that "they are not to assume what the facts are in that case, just the fact that he had a conviction for battery." The court would "instruct the jurors that we have no information at this time about the underlying facts of that case."

*Benedetti's Testimony*

Defense counsel informed the court that she had received audio transcripts of an interview Sergeant Ramirez conducted of Benedetti the day after the murder in which Benedetti stated that he frequently saw Goudeau "with markings on his face and a bloody nose as though he were fighting." Counsel did not know when Benedetti saw these fights. The trial court responded, "That's not sufficient because [Benedetti] has no idea how [Goudeau] got the markings." Defense counsel later stated that Benedetti previously stated: "'I've seen him get into a fight. I just don't know who he was fighting with, you know what I mean?'" Benedetti also stated that the last fight he saw occurred "'Like three months ago or something like that.'"

The trial court ruled the evidence inadmissible under Evidence Code section 352 because "[Benedetti is] so uncertain about that. I'm not going to allow that because I am going to allow the Bynum [testimony] and the prior [battery] misdemeanor. And this, to me, we don't know if it's an argument." The court stated that it would revisit the matter if defense counsel was able to discover more specific information about the fights that Benedetti allegedly witnessed. Counsel added that Benedetti also stated, "'Well, I seen him get into a fight before with a bloody nose. And fighting -- fighting with a bloody nose.'" The court permitted counsel to question Benedetti in court outside the presence of the jury and delayed a final ruling until more information could be gathered.

A few days later the court questioned Benedetti outside the presence of the jury regarding whether he had ever seen Goudeau engage in a fist fight. Benedetti responded that he had seen

46

Goudeau fighting "a couple times." He could not remember when the most recent fight occurred. He did not know who Goudeau was fighting with, or which person started the altercation. Someone told Benedetti that Goudeau got punched and had a bloody nose, but he did not see the fight occur. The trial court questioned Benedetti regarding whether there was a specific incident that he could recall, but Benedetti could not remember dates or details. Benedetti's memory was not refreshed by hearing a portion of his interview with Sergeant Ramirez in which he made statements about fights involving Goudeau read aloud.

The trial court ruled the evidence inadmissible under Evidence Code section 352. The court found that Benedetti's testimony was not "sufficiently concrete." Benedetti did not know who started the fights, who was involved, and it was not certain that Benedetti even saw Goudeau with a bloody nose.

The next day, defense counsel argued to the court that it did not matter who the aggressor was. She stated, "I think generally the fact that he's fighting at that location creates a type of a character that can be -- should be explored by the defense." The trial court responded, "And I just want to state very clearly for the record, he was so uncertain as to when, what happened, how much he saw, that it has such a small amount of probative value as to whether [Goudeau] would be the aggressor. . . I am denying the motion under [Evidence Code section] 352."

*Bynum's Testimony*

Defense counsel represented that Bynum would testify that "Goudeau was seen fighting directly at that same parking lot the

47

night before the murder." The court stated that it would allow Bynum's testimony for the purpose of showing that Goudeau was the aggressor, but that "he has to have direct knowledge of it. He has to have seen it. He can't have just heard about it." Defense counsel stated that Bynum's declaration stated he had seen the fight.

At a hearing outside the presence of the jury, it was established that Bynum had sustained three convictions for crimes of moral turpitude within a few years of trial, which the trial court ruled it would allow the prosecution to use for impeachment. Defense counsel proffered that Bynum would testify that a few days before the murder Goudeau was "acting aggressively" towards him and they had a confrontation. Bynum smelled alcohol on Goudeau's breath. Goudeau also "threw a punch" at Bynum and picked up a brick.

Bynum appeared at the hearing for questioning. He stated that he did not want to be in court, had nothing to do with the case, and was likely to lose his job if the parties called him to testify. The court permitted the prosecutor and a detective to interview Bynum over a break. Afterwards, the prosecutor informed the court and defense counsel that Bynum contradicted the defense's proffer: "[Bynum] said that a brick was not thrown at him. He said that he owed Mr. Goudeau money stemming from having purchased some drugs from him. He said that Mr. Goudeau came at him in a way that he didn't like. They got into a fight. Afterward, he gave him the money, they shook hands, and they went their separate ways."

The trial court asked defense counsel if he planned to call Bynum. Counsel stated that he had concerns about doing so: "Well, my understanding is that introduction of evidence showing

the victim's character for violence would then allow the prosecution to rebut with evidence of defendant's violent character."

The prosecutor then stated, "And I should mention that . . . Mr. Bynum also said he'd been in a fight with the defendant."

### **Analysis**

*Goudeau's Prior Battery Conviction*

Allagoa first contends that defense counsel provided ineffective assistance because he failed to introduce the fact of Goudeau's 2015 battery conviction. He asserts that there could be no reasonable tactical reason for counsel's decision. We disagree.

There were several reasonable tactical reasons for counsel to avoid introduction of the prior conviction. First, the conviction was for misdemeanor battery and the trial court ruled that it would give a limiting instruction informing the jury that battery can be the slightest touching and that the jurors could not speculate regarding the underlying facts of the conviction. Under the circumstances, the conviction was of very limited probative value to the jury because the jury had to accept that it was unknown whether Goudeau engaged in a physical fight.

Additionally, the prosecution could have called Bynum to testify regarding Allagoa's conduct under Evidence Code section 1103. Bynum's statements regarding his interaction with Goudeau were contradictory, and his most recent statements were more favorable to Goudeau. He stated unequivocally that he fought with Allagoa. Bynum was an unwilling witness, and

49

just as likely to hurt Allagoa's case as to help it. Having him testify would be risky, and could undermine the defense's theory that Allagoa was not the aggressor and instead acted in self-defense. Under the circumstances, we cannot conclude that defense counsel's performance was deficient. (*Mai, supra,* 57 Cal.4th at p. 1009.)

*Goudeau's Prior Violent Conduct*

Allagoa further contends that the trial court abused its discretion and violated his "compulsory process to produce evidence and due process right to a fair trial" by excluding Benedetti's testimony that Goudeau had previously engaged in fistfights in the liquor store parking lot under Evidence Code section 352. We disagree.

As the trial court stated, Benedetti's testimony had very limited, if any, probative value. He could not say when the fights took place, who Benedetti was fighting, or who instigated the fights. There was no question that a fight took place prior to the shooting. The issue was whether Goudeau or Allagoa was the aggressor. Benedetti's testimony would not illuminate that issue for the jury. The trial court did not abuse its discretion in determining that the probative value of the evidence was outweighed by the possible prejudice, consumption of time, and likelihood of confusing or misleading the jury. (*Shoemaker, supra,* 135 Cal.App.3d at p. 448.)

As a general rule, "a defendant has no constitutional right to present all relevant evidence in his favor." (*People v. Guillen* (2014) 227 Cal.App.4th 934, 1019 (*Guillen*).) Application of the ordinary rules of evidence does not impermissibly infringe on the

defendant's right to present a defense. (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1258 (*Gonzales*).) Thus, constitutional principles are not offended by rulings that exclude evidence that is repetitive, marginally relevant, or that poses an undue risk of prejudice or confusion of the issues. (*Id.* at p. 1259.) In order for a defendant's constitutional rights to override application of the ordinary rules of evidence, the proffered evidence must have more than slight relevance to the issues and must be of substantial and significant value. (*Guillen*, *supra*, at p. 1019.) Given the slight relevance of Benedetti's testimony, the trial court did not violate Allagoa's constitutional rights.

## VI. Admission of Facebook Evidence that Allagoa Possessed a 9 Millimeter Gun

Prior to trial, the prosecution sought to admit evidence of Allagoa's posts on Facebook demonstrating that he purchased a 9 millimeter handgun approximately three weeks prior to the murder, that the gun was in his possession five days before the murder, and that he was not inclined to lend it to a friend who asked to borrow it.

On August 5, 2016, Allagoa responded to a post containing a photo of a handgun:

"[Allagoa:] Oh shit the cueta.

"[The poster, Brian Childress:] I just cop it 4 450."

On August 6, 2016, Allagoa replied.

"[Allagoa:] I want one.

"[Childress:] He only had one but he said he got a 9 350.

"[Allagoa:] Tell him I want it A.S.A.P.

"[Childress:] Alright."

"[Allagoa:] You told him?"

On August 26, 2016, Allagoa exchanged posts with Peirce Wolf Hayley Mickens:

"[Mickens:] *Aye cuh Imma need the strap TM at 1:30 some [guys] trippin on us.*

"[Mickens:] *Over a bitch.*

"[Allagoa:] *RN?*

"[Mickens:] *Imma come to Thorne from Lawndale around 1 or 2. Imma need it by then cause them [guys] tryna pull up TM.*

"[Mickens again:] *They already did today.*

"[Allagoa:] *"I'll post wit you but I'm not givin it to you.*

"[Mickens:] *Imma give it back foo. Don't trip. It's just foe today.*

"[Allagoa:] *Sound dumb.*"

Defense counsel objected to the Facebook evidence on the grounds of authentication and undue prejudice under Evidence Code section 352. The trial court ruled the evidence would be admitted if it could be established that the posts were business records obtained from Facebook through a warrant that could be connected to Allagoa. It found the posts to be "very relevant and more probative than prejudicial" because the inference to be drawn was that the holder of the Facebook account had a gun five days before the murder that he retained in his possession. Moreover, the post was not remote in time. It was written just before the killing, which was committed with a firearm.

At trial, prosecution witness Alex Manica, a crime analyst from the Los Angeles Sheriff's Department, testified regarding the slang used in the posts. He explained that "cueta" meant gun, "I just cop it 4 450" meant that Childress just bought a gun for $450, and "he said he got a 9 350" meant that the person

Childress purchased the gun from had a 9 millimeter firearm that he would sell to Allagoa for $350.

Manica testified that "Aye cuh Imma need the strap TM at 1:30 some [guys] trippin on us. Over a bitch." meant hey friend, I'm going to need the gun tomorrow because some guys want to fight with us over a girl. "RN" meant "'Right now.'" "Imma come to Thorne from Lawndale around 1 or 2. Imma need it by then cause them [guys] tryna pull up TM" meant "'I'm going to come to Thorne from Lawndale around 1:00 or 2:00. I'm going to need it by then because them guys are trying to come tomorrow.'" "I'll post wit you but I'm not givin it to you" meant "I'll be there with you, but I'm not going to give it to you.'" "Imma give it back foo. Don't trip. It's just foe today." meant don't worry buddy, I'll give it back, it's just for today.

At trial, defense counsel presented evidence that the gun used to kill Goudeau belonged to Lias, rather than Allagoa. An expert witness for the defense, forensic scientist Babek Malek, testified that by using specialized equipment he was able to discern that Lias was holding "an object resembling a gun" during the fight.

In closing statements, the prosecutor argued that the Facebook posts demonstrated that Allagoa purchased a gun: "[W]e know that once he gets the gun -- and you'll recall a 9-millimeter. That is significant and we have additional evidence that supports that that's the gun that was used to kill Joseph Goudeau. We know that he doesn't want to get rid of that gun." "He's not getting rid of his gun. He is not lending his gun. For whatever reason, he wants to keep that gun." "We know five days before the murder, he's got a gun."

With respect to premeditation and deliberation, the prosecutor argued: "But we have -- and this is important when we talk about deliberation. We have the defendant hanging out in the parking lot. Someone shows up in a van, and the second that driver is done transacting . . . inside the store, defendant gets in that van and they drive off. That is at 8:11 p.m. [¶] In the intervening time, [Goudeau] is still hanging out in the parking lot." "[A]bout . . . 8:28, 8:29 defendant . . . walks into the parking lot. We're not really sure where he comes from. . . . He left in a van. This is the first time he's back on video. He walks into a parking lot and he immediately goes to this car. It's like a gray wagon, sport wagon, something like that. And he stands at that car for a couple minutes. . . . There are a few reasonable conclusions we can draw. He leaves to get a gun. Or, possibly, when he's standing at this car, he gets a gun from whoever is inside it. That's less likely because, again, we know he's got a gun." "He goes around the front of this S.U.V. and he immediately starts flexing. And it's almost like you can't make this stuff up; right? That he's got a gun. We know he's about to get in a fight. And it's like he's flexing in the direction that we last saw [Goudeau] go. Like he is ready to challenge him now. And the thing that is different is that he's got a gun now." "And we get a description from Mr. Curran -- right? -- about a gun flopping around in the pocket of the defendant. When you watch the video, it is clear that there is something heavy in his front right pocket. That's the gun that he is taking to the fistfight."

Defense counsel challenged the prosecutor's theory that Allagoa brought a gun to the parking lot: "[W]here is the gun in this case? There's no gun registered to Mr. Allagoa." Defense counsel averred that Allagoa was not the aggressor, but rather

acted in self-defense. She asserted that, based on the expert testimony of Malek, Lias was holding a gun.

In rebuttal, the prosecutor argued: "Now, [defense counsel] also said, 'There's nothing connecting him to a gun.' There are several things connecting him to a gun: the fact that he told someone in Facebook that he wanted a gun; the fact that someone said, 'Hey, can I borrow the strap?' and he said 'No, you can't'; and the fact that he's holding a gun and shoots and kills someone."

### Trial Court's Admission of the Facebook Evidence

Allagoa contends that the trial court abused its discretion and violated his constitutional rights under the Fifth and Fourteenth Amendments by improperly admitting evidence that he offered to bring a gun to a prior, unrelated fight in the August 26, 2016 Facebook posts, italicized above. This contention lacks merit.

The trial court did not admit the Facebook evidence as evidence of character or for the purpose of allowing the prosecution to show that Allagoa planned the murder days in advance. The court admitted the evidence for the purpose of showing that five days before the murder, Allagoa possessed a gun of the same caliber as the bullet that killed Goudeau and that Allagoa was not inclined to give the gun to someone else. The trial court did not abuse its discretion in doing so. Evidence that Allagoa had a gun in his possession five days before he shot Goudeau to death with bullets of the same caliber was highly relevant to the issue of whether the gun used to kill Goudeau was Allagoa's—a fact that the defense contested. (See *People v.*

*Sanchez* (2019) 7 Cal.5th 14, 55 [evidence that defendant possessed a gun prior to the shooting was admissible because it "'did not merely show that defendant was a person who possesses guns, but showed he possessed a gun that might have been the murder weapon'"].)  The August 5 and 6 posts tended to show that Allagoa wanted to buy a gun and that a 9 millimeter gun was available for sale, but the only evidence confirming that Allagoa actually owned a firearm was contained in the August 26 posts.

Although there was arguably a danger of prejudice, it was not as great as Allagoa suggests.  In the posts, Allagoa never stated that he intended to take the gun with him to back Mickens up in the fight, only that he would "post," which Manica explained meant that he would accompany Mickens to the fight.  Moreover, the evidence did not demonstrate that Allagoa actually brought a gun to the fight with Mickens—or went to the fight at all.  Allagoa's final post stated that the fight "[s]ound[ed] dumb."

The trial court properly weighed probative value against prejudice under Evidence Code section 352; it did not abuse its discretion.  Moreover, the court's ruling was an application of the ordinary rules of evidence and did not impinge on Allagoa's constitutional rights.  (*Gonzales*, *supra*, 54 Cal.4th at p. 1258.)

**<u>Defense Counsel's Failure to Object Under Evidence Code Section 1101</u>**

Allagoa argues that defense counsel's performance was deficient because counsel failed to object to the Facebook posts on the basis that they should be excluded under Evidence Code section 1101.  This contention also fails.

"'Subdivision (a) of [Evidence Code] section 1101 prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion. Subdivision (b) of section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition.' (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393.)" (*Fuiava, supra*, 53 Cal.4th at p. 667.)

The Facebook evidence was admissible to show that Allagoa used his own gun to kill Goudeau. Allagoa's use of his own gun tended to demonstrate that he made a conscious decision to kill Goudeau because making that decision (and possibly retrieving the gun) afforded him time for reflection prior to killing Goudeau. It is also evidence tending to show that Goudeau was not the aggressor in the fight. Evidence Code section 1101 permits use of the Facebook evidence to establish premeditation and deliberation or to rebut the theory that a defendant acted in self-defense. (Evid. Code, § 1101, subd. (b); *People v. Cage* (2015) 62 Cal.4th 256, 273.) Counsel is not ineffective for failing to object to the admission of properly admitted evidence. (*People v. Gray* (2005) 37 Cal.4th 168, 212.)

Moreover, the Facebook evidence was not used to show that Allagoa planned to kill Goudeau five days before he shot him as Allagoa claims, so Allagoa cannot demonstrate prejudice. The prosecution argued that premeditation and deliberation could be inferred in part from Allagoa's choice to bring the gun to the parking lot on the day of the murder. From the facts that: (1) a 9 millimeter gun was in Allagoa's possession five days earlier, and

57

(2) Allagoa showed a reluctance to part with the gun, it could reasonably be inferred that Allagoa had the gun on the day that Goudeau was murdered with a bullet of the same caliber, and that Allagoa used that gun to shoot Goudeau. The prosecutor theorized that Allagoa made the decision to retrieve the gun either when he left the parking lot in the van or when he walked over to the gray sport wagon. The fact that Allagoa retrieved the gun demonstrated that he had adequate opportunity for premeditation and deliberation. The prosecutor never suggested that Allagoa intended to kill Goudeau before the day of the murder. Having failed to demonstrate prejudice, Allagoa has not shown counsel was ineffective.

## VII. Cumulative Error

Allagoa contends that even if no single error warrants reversal, he was prejudiced by the cumulative effect of the errors at trial. We disagree.

"The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.' [Citation.]" (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.) Here, we review Allagoa's claim of cumulative error to determine whether it is "reasonably probable a result more favorable to defendant would have been reached in the absence of the alleged errors." (*People v. Carrera* (1989) 49 Cal.3d 291, 332 [citing the standard in *People v. Watson* (1956) 46 Cal.2d 818, 836]; see *People v. Millwee* (1998) 18 Cal.4th 96, 168 [Supreme Court rejects defendant's cumulative prejudice argument, stating "[o]ur careful review of the record persuades us that the trial was fundamentally fair and its determination reliable"].)

The internet searches showing that Allagoa sought legal assistance after he committed the shooting should not have been admitted, but their admission and the prosecutor's remarks regarding them do not undermine the fact that Allagoa received a fair trial and due process. Overwhelming evidence supported the verdict. It is not reasonably probable that the outcome would have been more favorable absent the alleged errors.

**DISPOSITION**

We affirm the trial court's judgment.

MOOR, J.

We concur:

RUBIN, P. J.

KIM, J.

59